IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CARMEN LEIGH HILLERICH,
      Plaintiff,

vs.                                Case No.: 5:10cv326/RH/CJK

MICHAEL J. ASTRUE,
Commissioner of Social Security,
      Defendant.

---

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v.  The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's applications for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401-34.

      Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are not supported by substantial evidence. The decision of the Commissioner, therefore, should be reversed.

## PROCEDURAL HISTORY

Claimant protectively filed an application for DIB on March 17, 2005, alleging disability since February 15, 2002, due to chronic pain, fibromyalgia, muscle/ligament/fascia disorder, depression, and endometriosis.  T. 29, 36A-37, 58, 85-89, 98.[1]  Claimant's date last insured for the purposes of DIB, or the date by which her disability must have commenced in order to receive benefits, was December 31, 2006.  T. 29.

Claimant's applications were denied by the State agency initially and again upon reconsideration.  T. 36A-38, 56-58, 62-65.  Claimant timely requested a hearing and appeared in that hearing before Administrative Law Judge Stephen C. Calvarese ("ALJ") on October 18, 2007, in Lynn Haven, Florida.  T. 29, 55.  Claimant was represented by attorney Brian A. Dusseault.  Paul R. Dolan provided vocational testimony at the Commissioner's request.  T. 29, 50.  On February 27, 2008, the ALJ issued a decision denying claimant's application for disability insurance benefits.  T. 26-36.  Claimant timely requested review of the ALJ's decision and submitted a memorandum with additional evidence.  T. 25, 464-65, 468-99.  After several erroneous notices were issued, on October 15, 2010, the Appeals Council denied claimant's request for review.  T. 6-25, 466-67.

## FINDINGS OF THE ALJ

---

[1] The administrative record, as filed by the Commissioner, consists of four volumes (doc. 11 through 11-3), and has 546 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

In his written decision the ALJ made the following findings and conclusions relative to the issues raised in this appeal:

1.  Claimant last met the insured status requirements of the Act on December 31, 2006.

2.  Claimant did not engage in substantial gainful activity during the period from her alleged onset date of February 15, 2002, through the last insured date of December 31, 2006.

3.   Through the date last insured, claimant had the following severe impairments[2]:  fibromyalgia and endometriosis.

4.   Through the last insured date, claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Through the date last insured, claimant had the residual functional capacity ("RFC") to sit, stand, and walk for six hours each during an eight-hour work day; lift and carry ten pounds frequently and twenty pounds occasionally; and occasionally climb ladders, ropes, and scaffolds.  Claimant could frequently use her dominant right hand and fingers.  She should avoid exposure to hazards, dangerous machinery, and unprotected heights.   Claimant had no other manipulative, communicative, or environmental limitations.

6.  Through the date last insured, claimant's RFC did not prevent performance of her past relevant work as an administrative clerk and researcher.

_____

[2] A severe impairment is one that "significantly limits your physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).

*Case No: 5:10cv326/RH/CJK*

7.  Claimant was not under a disability as defined in the Act at any time from February 15, 2002, the alleged onset date, through December 31, 2006, the date last insured.  T. 29-36.

## STANDARD OF REVIEW

"Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards." *Olds v. Astrue*, No. 5:09cv319/RS/EMT, 2011 WL 691595, at *1 (N.D. Fla. Jan. 19, 2011); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot,

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1.  If the claimant is performing substantial gainful activity, she is not disabled.

2.   If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.   If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.   If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.   Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 404.1512. "If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Olds*, 2011 WL 691595, at *2. "If the

Commissioner carries this burden, the claimant must then prove [she] cannot perform the work suggested by the Commissioner." *Id.*

FACT BACKGROUND AND MEDICAL HISTORY[3]

On December 8, 2000, claimant underwent left ovary removal by Deborah Edgeworth, M.D., due to multiple and painful cysts. T. 161-62. On January 11, 2001, a colonoscopy, ordered for complaints of right lower quadrant pain, was deemed normal. T. 168. Claimant received general medical care and treatment for right groin, pelvic, and abdominal pain from internist Ketan A. Patel, M.D., from November 30, 2000, to January 17, 2001. T. 170-84. On November 30, 2000, claimant reported a two-month history of pain and swelling in her lower right quadrant, severe enough to interfere with her sleep and her work, and was prescribed Vioxx and Percocet. T. 181-82. On December 28, 2000, Dr. Patel noted that claimant's severe pain could be incapacitating, and prescribed Dilaudid instead of Percocet. T. 174. On January 16 and 17, 2001, claimant continued to complain of significant pain and discomfort in the right lower quadrant and pelvic area with swelling. T. 171-72. Dr. Patel noted that Ms. Hillerich was "on high dose Zoloft and Ambien at nighttime but does not seem to be all that much better." T. 172. Claimant reported that Dilaudid helped the pain but did not take away the discomfort completely, and that her pain subsided for only a short period of time after her gynecological surgery. T. 171-72. She reported worse pain with walking, but noted

---

[3] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, this synopsis of medical evidence will be supplemented as called for in the Analysis section.

*Case No: 5:10cv326/RH/CJK*

that the pain was otherwise constant.  T. 171.  Dr. Patel noted tenderness in the groin area, recommended further spinal evaluation due to pain radiating down the leg, and prescribed Vioxx, Xanax, and Lortab for severe pain and changed Zoloft to Celexa. T. 171.

A January 18, 2001, pelvic MRI (magnetic resonance imaging) read normal except for an adnexal cystic complex.  T. 202.  A January 19, 2001, lumbar spine MRI identified an increased signal in L5, possibly an atypical hemangioma, and an L5-S1 annular tear.  T. 201.  April 12, 2001, EMG (electromyography) and NCV (nerve conduction velocity) studies were read as normal.  T. 185.

On April 16, 2001, claimant saw surgeon Ted R. Wilson, who noted that she had been examined by Dr. Ramos and her pain did not seem related to the urologic tract.  T. 221.  Dr. Wilson noted that claimant was returning to work, and on May 17, 2001, was working four hours a day even though her pain was unchanged.  T. 221. On May 19, 2001, Dr. Wilson noted that claimant was "very anxious because of the degree of pain she has had."  T. 225.  He also noted a history of an accident with injury to the perineum five years prior.  T. 225.  On May 26, 2001, Dr. Wilson characterized claimant as "[presenting] with a very difficult problem with pain on a scale of 1 to 10 of 4 to 5 with taking Duragesic.  The patient has a problem of prior pain syndrome and at this time we do not have an accurate diagnosis."  T. 222.  He further opined, "I do not recommend surgical intervention in this patient" and noted that Ms. Hillerich was "obviously under stress . . . ."  T. 222.  On August 29, 2001, Dr. Shumate, a neurologist examining claimant on referral, noted that the groin pain persisted and was only "liveable" despite treatment with Fentanyl and Neurontin.  T.

184.  On July 10, 2003, urologist J. Nicole Eisenbrown, M.D., opined that claimant's chronic right groin pain was not related to her urinary tract.  T. 411.

Claimant received treatment for her chronic groin pain from gynecologist Dr. Deborah Edgeworth from August 18, 2004, to October 20, 2005, while transitioning between pain management physicians.  T. 293-303.  Dr. Edgeworth diagnosed "chronic right groin pain with unknown etiology, that is interfering with her daily life."  T. 292.

On January 8, 2004, psychiatrist John T. Renick, M.D., evaluated Ms. Hillerich for her ongoing depression.  T. 407.  Dr. Renick observed that she "has had a series of failures" with antidepressants and antidepressant augmentation.  T. 407.  "Virtually nothing we have used has worked on a varying incapacitating depression" and claimant was at that time taking "Adderall and Zoloft, which appear to have worked about as well as anything we have tried."  T. 407.  Dr. Renick recommended electroconvulsive therapy ("ECT").  T. 408.

On December 23, 2004, claimant underwent evaluation by psychiatrist George Michas, M.D.  Dr. Michas diagnosed major depressive disorder, severe, recurrent and continuous and a chronic pain problem.  T. 197.  He also noted claimant had been treated for depression over twelve years.  T. 192.  The depression was manifested by "loss of pleasure," "no energy," "difficulty concentrating," "no socialization," and "some withdrawal."  T. 193.  She was oriented in all three spheres, with intact memory, but with notably depressed affect.  T. 197.  Dr. Michas discussed with claimant the risks and benefits of ETC.  T. 199.

On January 10, 2005, claimant underwent a psychological evaluation with Elizabeth A. Michas, Ph.D., for purposes of diagnostic clarification and ECT treatment planning.   T. 365-66.   Diagnostic psychological testing indicated a diagnosis of major depressive disorder, recurrent and severe.  The personality profile indicated schizoid personality disorder with compulsive features.  T. 366.

Subsequently, claimant was admitted to Ft. Walton Beach Medical Center and underwent ECT sessions on January 12 and 14, 2005, in this inpatient setting.  T. 370. Dr. G. Michas noted that claimant had been referred by Dr. Renick for ECT due to her history and current condition, and although claimant had an excellent initial response, she was having difficulty being confined to the unit.  T. 369- 70.   The discharge diagnosis was major depression, recurrent; dysthymic disorder; and chronic pain disorder.  T. 371.  Claimant underwent two more additional ECT treatments, on an outpatient basis, by February 4, 2005.  T. 372-73.

On September 6, 2005, claimant was examined by psychologist James E. Hord, Jr., Ph.D., at the Commissioner's request.  T. 242-44.  Upon examination, Dr. Hord noted that claimant appeared "very stressed" with a mood and affect "marked by depression and considerable anxiety."  T. 243.  Dr. Hord noted that claimant "has had considerable services in the past but she is extremely anxious at this time.  The anxiety is going to be troublesome for her in my opinion."  T. 243.  Dr. Hord diagnosed major depressive disorder, recurrent, moderate; rule out PTSD, and rule out ADD.  T. 243.  Finally, Dr. Hord noted that claimant was receiving several medical procedures for her pain, "but I think with her level of anxiety her problems will likely continue."  T. 244.

On November 8, 2006, claimant first saw psychiatrist John R. Billingsley, M.D., to restart psychiatric treatment after Dr. Renick left private practice.  T. 335. Claimant reported doing "fairly well in terms of her depression" and felt that "a lot of the depression is actually being maintained by the fact that she has the chronic pain and she's not able to work."  T. 335-37.  Claimant continued to see Dr. Billingsley for depressive disorder, depression secondary to a medical condition, and attention-deficit/hyperactivity disorder in January and March 2007.  T. 333-34.

On February 26, 2007, claimant saw neurologist Thomas Derbes, M.D., on referral from Dr. Edgeworth for complaints of shoulder pain, back pain, and groin pain.  Dr. Derbes charted the duration of pain at six to seven years.  T. 433.  Dr. Derbes assessed the problem as "right groin pain . . . neuralgia vs tendinitis."  T. 432. Dr. Derbes' chart shows right groin pain, with quality of "aching, penetrating, throbbing, tender, nagging, shooting, burning, numb, exhausting, miserable, gnawing."  T. 430, 426, 422, 416.  As of May 22, 2007, Dr. Derbes had added "right pelvic pain" to his assessment, and noted, "right genitofemoral branch neuralgia (labia)."  T. 415.

On July 24, 2008, Dr. Andrea Trescot, a pain specialist at the University of Florida, noted that prior lysis of adhesions and cryoneuroablation of the ilioinguinal nerve helped, but the pain returned.  T. 495.  Claimant complained of nausea from the pain, with numbness, tingling, and weakness in the groin.  T. 495.  A right genitofemoral nerve block was administered.  T. 495.  On August 25, 2008, claimant underwent cryoneuroablation of the right genitofemoral nerve and lysis of adhesions

with Dr. Trescot, with a postoperative diagnosis of "genitofemoral neuralgia" and "pelvic pain."  T. 492-94.

Dr. Trescot, after leaving the University of Florida healthcare system, referred claimant to Dr. Khanna for evaluation of her apparent leaking discs, which were believed to be the etiology of her epidural adhesions and subsequent radiculopathy. T. 493.  Dr. Trescot also recommended that claimant seek further evaluation with Dr. Sandeep for the sacroiliac pathology.  T. 493.

On November 11, 2008, claimant first saw Pain Management Specialists (Dr. Khanna's practice), for pain management on the referral from Dr. Trescot.  T. 489. Her condition was reviewed, and it was noted that she was "fairly well managed" on Duragesic.  T. 490.  A January 20, 2009, lumbar spine MRI identified L5-S1 spondylosis with disc bulge contacting the thecal sac at the exit point of the S1 nerve root and multilevel mild lumbar facet arthrosis particularly at the L4-5 and L5-S1 levels.  T. 485.  On February 5, 2009, the chart noted discussion of a spinal cord stimulator with Dr. Khanna, and noted that claimant's pain was "somewhat controlled" with Duragesic and hydrocodone for breakthrough pain.  T. 484.

On February 16, 2009, Ms. Hillerich had bilateral sacroiliac joint injections for pain management.  T. 482.  On March 27, 2009, Dr. Burns opined that claimant had pudendal neuropathy of unknown etiology.  T. 480-81.  On April 24, 2009, claimant underwent an ilioinguinal nerve block diagnostic procedure.  T. 478.  On June 29, 2009, claimant received a lumbar epidural steroid injection for pain control in addition to prescriptions to Vicoprofen and Duragesic.  T. 475, 477.

## HEARING BEFORE THE ALJ

Claimant, Carmen Hillerich, testified at the administrative hearing before the Honorable Stephen Calvarese, ALJ, as did vocational expert Paul Dolan. Claimant has experienced groin pain for six to seven years. T. 507. The condition was very difficult to diagnose. After many years, she was diagnosed with genitofemoral neuralgia, and referred to Dr. Trescot in Gainesville. T. 507. Claimant was previously employed doing clerical work. T. 509. She described her last employment as an investigator for the United States District Court, but she left, because "physically, I could not hang on any longer." T. 508-09. Upon questioning by the vocational expert, claimant provided specific information about her last job. She was an investigative support specialist for the United States Probation Office. T. 512. She ran criminal backgrounds, traveled to the courthouses to pull criminal records, and prepared inquiries to other districts concerning criminal records. T. 512.

She found she was unable to focus on her tasks, she became anxious, and needed to "move and adjust to alleviate [pain]." T. 514. She is unable to get comfortable, no matter whether sitting or standing. T. 514. If she had to sit for eight hours, she would never get anything done, due to her need to constantly get up and down. T. 515. In a typical day, she might lie down for four or five hours, sit for an hour, and stand the rest of the time. T. 515. She is able to walk for thirty minutes. She dislikes being alone, so visits her mother, less than a mile away, most days. T. 517. She does not prepare any meals, and has not done so in a year. T. 518. Claimant can drive twenty-five miles, but then must stop due to back and groin pain. T. 523.

Ms. Hillerich described her mental condition.  She has suffered from depression for a number of years, going back to the death of her first husband and her father.  T. 523.  Antidepressants have not helped, and as a result, she had ECT treatments by Dr. Michas.  T. 523-24.

Vocational consultant Paul Dolan sat in on Ms. Hillerich's testimony, and also reviewed her file.  He described claimant's past work as an administrative clerk and researcher.  T. 536.  He would classify the research position as sedentary.  T. 536.  The ALJ formulated a hypothetical question comprising several assumptions. T. 539.  The question assumed no mental restrictions, some limitations on lifting and carrying, ability to sit for six hours in an eight-hour day, with normal breaks, and some limitations in use of hands and fingers.  T. 539-40.  Mr. Dolan was of the opinion that such a person could go back to work as an administrative clerk or researcher.  T. 540.

The ALJ then posed a second hypothetical.  This time, the ALJ asked Mr. Dolan to assume the claimant had testified truthfully about her pain and other limitations.  Dolan, albeit in an indirect manner, noted that such a person might not be able to sustain "competitive work activity." T. 542-43.  He took into consideration the severity of the pain, and need to lay down four to five hours a day.  Such limitations would prevent a job.  T. 543.

<u>ANALYSIS</u>

Claimant raises three issues in this appeal.  First, she argues the ALJ erred in rejecting the opinion of Dr. Andrea Trescot, a treating physician.  She contends next the ALJ erred by failing to find claimant's groin pain and mental impairment not severe.  Finally, she urges error in the ALJ's determination of claimant's credibility.

The ALJ noted that Dr. Trescot had written a letter in support of claimant's application.  The letter recited Dr. Trescot's diagnoses of genitofemoral neuralgia, ilioinguinal neuralgia, low back syndrome, sacroiliac pathology coccyx pain, epidural adhesions, and carpal tunnel syndrome.  T. 35.  Dr. Trescot's chart reveals she reached a primary diagnosis of genitofemoral neuralgia in July 2007,  T. 448-49, and continued to follow Ms. Hillerich once a month until at least January 2008.  T. 451.  The ALJ nonetheless afforded little weight to the opinions and reports of Dr. Trescot, "since her treatment of the claimant began at a time significantly later than the claimant's date last insured."  T. 35.  The last insured date was December 31, 2006, a little more than six months before claimant saw Dr. Trescot.  The ALJ erred by rejecting the opinions and findings of Dr. Trescot.

It is well-settled that "[t]he opinion of a treating physician is to be given substantial weight in determining disability."  *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986); *see also Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) ("Absent a showing of good cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight by the Secretary.").  "'[G]ood cause' exists when the:  (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  "The ALJ *must clearly articulate* the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (emphasis added); *see also MacGregor v. Bowen*, 786

F. 2d. 1050, 1052 (11th Cir. 1986) ("There are specific rules that we follow in deciding whether evidence is substantial.  The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary.   The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight".).

Viewed in the context of all the medical evidence in this case, the sole reason given by the ALJ for under-weighting Dr. Trescot's findings falls short of adequate. First, Dr. Trescot assumed care of claimant barely six months after the last date insured.  Nothing of record indicates claimant's condition changed markedly in that time span.  Moreover, the problem of groin pain had persisted for some seven years. Claimant had been seen by a series of doctors, but only had a correct diagnosis shortly before her referral to Dr. Trescot.  Claimant had first sought treatment for the groin pain in 2000.  Only when seen by Dr. Derbes in early 2007 did any treater raise the issue of genitofemoral neuralgia.  Dr. Derbes, who saw claimant in early 2007, consistently charted groin pain, sometimes characterizing it as "unbearable," and noted an onset of six to seven years before, with an unchanged course.  T. 433. Derbes spent several months in formulating a diagnosis, conducting examinations,

and ordering diagnostic studies.  Only at the end of his documented treatment, some three months after the first visit, did Dr. Derbes chart genitofemoral neuralgia.  T. 415.  This course of events, considered in light of the consistent complaints, and the lengthy course of care and attempted diagnoses, suggests that the condition, noted and treated by Dr. Trescot, was difficult to diagnose.  Notably, the ALJ did not question the Trescot diagnosis or reports, but rested his rejection of these upon the dates of treatment.  The medical records show, however, that the examinations and treatments provided by Drs. Edgeworth, Derbes, and Trescot came over a succession of a few years, beginning well before expiration of the insured period.  Moreover, the observations of these physicians are not inconsistent.

The ALJ provides no support for the theory that Dr. Trescot's reports are temporally doomed.  The Commissioner, in his memorandum, can only say that even though the Trescot treatment came just half a year after expiration of insured status, it was "still after the expiration of Claimant's insured status."  Certainly true, this does not really offer any support for the stance taken by the ALJ.  Of note here, the groin pain had plagued claimant for many years.  She had literally gone hither and yon seeking diagnosis and treatment, never asserting a change in the condition.  The diagnosis and treatment rendered by Dr. Trescot was, perhaps, the best medical evidence speaking to claimant's condition during the relevant time, despite the lapse of some six months between insured status and diagnosis.  This conclusion is bolstered by the records of Dr. Derbes, who first saw claimant only weeks after the time focused upon by the ALJ.  T. 433.  Stated otherwise, the course of treatment remained the same; Dr. Trescot's assumption of care in mid-July 2007 is not

persuasive as a reason to disregard her views.  Because the ALJ did not apply the Eleventh Circuit standards in evaluating the evidence provided by Dr. Trescot, a treating physician, the decision should be vacated.

Claimant next urges error in the ALJ's refusal to classify her groin pain and her mental impairments as "severe."  Identification of severe impairments comes at the second phase of the sequential evaluation.  Under the Regulations, a severe impairment is one that "significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).  As applied, the step two severity determination is a threshold inquiry used to screen out "trivial" claims, meaning an impairment is not severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984); *see also Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987); *Stratton v. Bowen*, 827 F.2d 1447, 1453 (11th Cir. 1987); *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).  The Commissioner has adopted an interpretive ruling that specifically addresses the criteria to determine whether medical impairments are severe.  The ruling provides in part:

> As explained in 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity]. An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an

individual's ability to work even if the individual's age, education, or
work experience were specifically considered (i.e., the person's
impairment(s) has no more than a minimal effect on his or her physical
or mental ability(ies) to perform basic work activities).  Thus, even if an
individual were of advanced age, had minimal education, and a limited
work experience, an impairment found to be not severe would not
prevent him or her from engaging in SGA.

SSR 85-28, 1985 WL 56856, at *3 (1985).  I will first address this claim as it applies
to the groin pain.

The analysis here takes into account my recommended ruling on the import of
Dr. Trescot's evidence.  As noted by Dr. Trescot, but apparently discarded by the
ALJ, groin pain, now identified as genitofemoral neuralgia, "is present constantly and
to such an extent, even with medication, as to prevent adequate performance of daily
activities or work.  These conditions are causing severe nerve pain in her lower back
and groin and are further irritated by most movements including bending, lifting, and
kneeling.  Pain is increased greatly within a couple of minutes of sitting.  Wearing
certain clothes (nylons, pants, etc.) increases pain to the extent the patient has had to
return home to remove clothing as the pain becomes so overwhelming."  T. 451.  As
also noted by Dr. Trescot, the medical charts bear out a duration of "this condition for
years."  T. 451.

On the question of claimant's persistent groin pain, the ALJ also failed to note
the import of Dr. Derbes' chart.  The decision states the following, *in toto*, concerning
Dr. Derbes' treatment,

"On March 2, 2007, Dr. Derbes examined the claimant with regard to
her groin and hip pain.  He diagnosed the claimant with right groin pain,

*Case No: 5:10cv326/RH/CJK*

> neuralgia vs. tendonitis and ordered a computed tomography (CT) scan.
> On March 2007, Dr. Derbes discussed with the claimant an exercise
> program and recommended physical and massage therapy."

T. 31.  This comment inadequately disposes of Dr. Derbes' actual observations
("aching, penetrating, throbbing, tender, nagging, shooting, burning, numb,
exhausting, miserable, gnawing").  T. 414-33.  The records of Drs. Derbes and
Trescot, viewed along with claimant's own testimony, mandates inclusion of the
groin pain—genitofemoral neuralgia—as a severe impairment, and therefore its
consideration on the ultimate issue in the case.  "An impairment is not severe only if
the abnormality is so slight and its effect so minimal that it would clearly not be
expected to interfere with the individual's ability to work, irrespective of age,
education or work experience." *McDaniel*, 800 F. 2d at 1031.  "Claimant need show
only that her impairment is not so slight and its effect is not so minimal." *Id.*

   As to the mental impairment, the ALJ's treatment of the condition is also
inadequate.  The decision focuses upon "claimant's allegations of diminished memory
and Attention Deficit Hyperactivity Disorder (ADHD) . . . ."  The memorandum filed
by claimant discusses only her depression.  (Doc. 15, 18-21)  In fairness to the ALJ,
he was misled at the hearing.  Both claimant and her trial counsel spoke primarily of
the ADHD and memory issues.  Because the record has substantial evidence of
significant depression, I do not consider the argument as to that condition to have
been waived.  The ALJ was certainly aware of the record in this regard, as he
discussed the depression in his formulation of Residual Functional Capacity.  T. 34-
35.  This discussion notes that claimant received "conservative" treatment through
medication for depression and anxiety.  The ALJ concluded these symptoms are

"well-controlled" on the medication.   T. 35.   No reading of the reports of the examining mental health professionals can bear these contentions out.

Ms. Hillerich received a series of at least four ECT treatments on an inpatient basis.   T. 369-70.   Dr. Renick recommended ECT, because, "Virtually nothing we have used has worked on a varying incapacitating depression, and we have used drugs in all categories including a combination of medication." T. 407.   The findings of the consulting examiner, Dr. Hord, seeing claimant on referral from the Office of Disability Determinations, similarly do not support exclusion of the mental condition as a severe impairment.   Dr. Hord found "major depression, recurrent, moderate." T. 243.   He concluded that with claimant's level of anxiety, "her problems will likely continue."   T. 244.   The ALJ's rejection of mental impairment as severe does not grapple with these observations, and was error.

Failure to classify an impairment as severe at stage two will not always necessitate a finding of reversible error. "Step two is a threshold inquiry." *McDaniel*, 800 F.2d at1031.   Under this step of the sequential analysis, only the most trivial claims will be rejected.   *Id*.   Because step two is a threshold inquiry, and simply allows the ALJ to proceed to the next step, which the ALJ did in this case, any error as to the groin pain and mental impairments must be examined under a harmless error standard.   *See Delia v. Comm'r of Soc. Sec.*, No. 10–15092, 2011 WL 2748622, at *1 (11th Cir. July 14, 2011) ("Because the ALJ gave full consideration to the consequences of Delia's mental impairments on his ability to work at later stages of the analysis, the error at step two was harmless and is not cause for reversal.").

On the other hand, an erroneous finding as to "severe" impairments at step two may improperly foreclose a claimant's "ability to demonstrate the merits of her claim for disability with respect to her former work activities." *Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985).  Considering that the ALJ here did not include any mental impairments in the formulation of Residual Functional Capacity, such formulation was flawed.  This is so because impairments must be evaluated in combination at all stages of the analysis.  *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990); *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); 20 C.F.R. §§ 404.1523 and 416.923. Impairments must be evaluated in combination even though some impairments are not severe.  *See Hudson v. Heckler*, 755 F.2d 781, 785 & n.2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that an ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled." *Davis*, 985 F.2d at 534.

Here, the additional severe impairments are quite distinct from the two severe impairments accepted by the ALJ—fibromyalgia and endometriosis.  Moreover, the ALJ rejected the strongest evidence of groin pain, and mischaracterized the evidence of mental impairment.  The ALJ did not, therefore, adequately consider the breadth of claimant's severe impairments in his formulation of Residual Functional Capacity. The error is not harmless.

On her final point, claimant takes issue with the ALJ's credibility determination.  The ALJ found that although "claimant's impairments could have been reasonably expected to produce the alleged symptoms, . . . the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." T. 35. Claimant argues these findings are unexplained and unsupported by the evidence of record. (Doc. 15, 19)

The law on this question is well-known. It is within the ALJ's discretion to determine that a claimant's claims of pain and other symptoms are not credible. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). "But the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Id.* "After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992). "If the ALJ refused to credit subjective pain testimony where such testimony is critical, he must articulate specific reasons for questioning the claimant's credibility." *Id.* "While an adequate credibility finding need not cite 'particular phrases or formulations . . . broad findings that [a claimant] lacked credibility and could return to her past work alone are not enough to enable [the court] to conclude that [the ALJ] considered [claimant's] medical condition as a whole.'" *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting *Jamison v. Bowen*, 814 F.2d 585, 588-90 (11th Cir. 1987)). "Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Holt*, 921 F.2d at 1223.

In light of the recommended resolution of the points involving Dr. Trescot's evidence, and the additional severe impairments, the credibility determination may not stand. Dr. Trescot (and Dr. Derbes) provide strong justification for claimant's

complaints of pain.  As previously explained, these opinions were wrongly rejected or undervalued.

Under examination by the ALJ, the vocational expert acknowledged that, if one considers the severity of claimant's pain and discomfort, as well as her inability to sit for an hour, and her need to lay down four to five hours a day, no jobs would be available.  Under *Holt*, these additional limitations must now be included in the Residual Functional Capacity, as assumed by the expert.

<u>REMEDY AND CONCLUSION</u>

I have noted multiple instances of error in the Commissioner's decision.  The controlling statute provides, "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C.  § 405(g).  In this case, the inclusion of the additional severe impairments, and proper crediting of Dr. Trescot's evidence, as well as that of Dr. Derbes, all of which further bolster claimant's credibility, certainly might suggest that reversal for an award of benefits is appropriate.  Precedent holds that, "[w]here the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."  *MacGregor*, 786 F.2d at 1052.  Here, I have found that the ALJ wrongly discounted the opinions of Dr. Trescot, a treating physician.  Also, in the instance of an improper credibility determination as to subjective pain testimony, as I have found here, the Eleventh Circuit has held that as a matter of law, the testimony must now be accepted as true.

*Holt*, 921 F.2d at 1223.  Of note, however, the parties have neglected to brief the question of remedy.

Of late, the question of remedy in these cases has been discussed in this circuit with some regularity.  *See, e.g.*, *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 835 (11th Cir. 2011) (remanding for further consideration where ALJ "failed to adequately explain the weight he afforded to the opinions of . . . treating and examining physicians"); *Howell v. Astrue*, No. 8:10–CV–2175–T–26TGW, 2011 WL 4002557 (M.D. Fla. Aug. 16, 2011) (remanding where ALJ failed to provide a meaningful explanation for credibility determination); *Freeman v. Astrue*, No. 1:10–cv–997–TFM, 2011 WL 2551181, at *3 (M.D. Ala. June 27, 2011) (remanding where ALJ "made a credibility determination, but did not adequately explain it"); *Carpenter v. Astrue*, No. 8:10-CV-290-T-TGW, 2011 WL 767652 (M.D. Fla. Feb. 25, 2011) (same).  These cases opt for remand in instances of error involving treating physician opinion and subjective pain testimony.  I conclude that this case is due to be remanded, but without prejudice to other parties who might more fully brief the issue of remedy, or who might persuade the court that the evidence points unequivocally to a specific finding, without need for remand.

Accordingly, it is respectfully RECOMMENDED:

1.   That the Commissioner's decision be REVERSED, and the matter REMANDED for further proceedings consistent with this order.

2.   That the court reserve jurisdiction to award attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412.

At Pensacola, Florida, this 17th day of January, 2012.

/s/ *Charles J. Kahn, Jr.*
CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE

<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).